UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROGER PIERCE, ET AL.

    Plaintiffs,

v.

ROBERT BURKART, ET AL.,

    Defendants.
_____/

Case No. 03-74250
(Consolidated with
 Case No. 04-74185)
Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' NEWLY FILED "KNOCK AND ANNOUNCE" CLAIM [74, 75]**

This is a civil rights action, brought under 42 U.S.C. § 1983, and alleging that Defendant Officers violated Plaintiffs' Fourth and Fourteenth Amendment rights by failing to comply with the "knock and announce" rule when executing a search warrant at Plaintiffs' home on October 31, 2001. This matter comes before the Court on Defendants' motions for summary judgment. For the reasons stated below, this Court GRANTS Defendants' motions.

**I.  Facts**

The conduct at issue here occurred on Halloween night, October 31, 2001, around 11:00 p.m. Defendant Officers Burkart, Nicholas, St. Germaine and Lawson, all members of the South Oakland Narcotics and Intelligence Consortium ("SONIC"), executed a warrant issued that same day to search Plaintiffs' home at 648 S. Winding Dr., Waterford Township, Michigan. Officers Burkart and Nicholas are employed by the Farmington Hills Police Department. Officers St. Germaine and Lawson are employed by the West Bloomfield

Township Police Department.

The search warrant provided that the police were to search all rooms, persons, and vehicles located at Plaintiffs' home on S. Winding Drive in Waterford Township and to seize all controlled substances, firearms, and narcotic paraphernalia among other drug-related items. It described Plaintiffs' dwelling "as being a single story ranch." (Pls.' Resp., Ex. H; Docket No. 42, Pl.'s 10/5/04 Motion, Ex. A at 1.)

The Affidavit supporting the search warrant was prepared by Officer Gruenwald of the West Bloomfield Township Police Department.[1] It provided the following. A Confidential Informant ("CI") had contacted Officer Gruenwald, a West Bloomfield police officer, during the week of August 20, 2001. The CI told Officer Gruenwald that a male known as "Rick" was trafficking marijuana, that the CI had purchased marijuana from Rick on several occasions, that Rick lives at 648 S. Winding Dr., Waterford Township, Michigan, with his girlfriend, Elizabeth Mary Pierce, and that Elizabeth Mary Pierce is also selling marijuana with Rick out of 648 S. Winding Drive in Waterford Township. (Docket No. 42, Pl.'s 10/5/04 Motion, Ex. A at 3.)

Surveillance officers observed a vehicle registered to Elizabeth Mary Pierce parked in the drive at 648 S. Winding Drive. Moreover, a number of controlled purchases of marijuana were conducted by the CI under Officer Gruenwald's supervision within a five week period. In each controlled buy, police surveillance observed Rick exit the residence at 648 S. Winding Drive, meet the CI at a predetermined location, sell the CI marijuana, and observed Rick return directly after the buy to 638 S. Winding Drive and saw him enter

---

[1]Officer Gruenwald is not named as a Defendant in this suit.

the house.  (*Id.* at 3-4.)

Officer Gruenwald, who prepared the search warrant, conducted the pre-search briefing of Defendant Officers, who were all part of the entry team, and other officers taking part in execution of the search warrant.  These Officers were informed that this was a single family home; that the target of the search was the live-in boyfriend of the homeowners' daughter, Elizabeth Pierce; that the target's name was Ricky Marchand and he was involved in selling marijuana out of the home; and that Elizabeth Pierce was possibly involved in selling drugs as well. (Burkart Dep. at 31-35, 43, 66-67; St. Germaine Dep. at 15.)

The search was executed on Halloween night, October 31, 2001, which fell on a Wednesday, at around 11:00 p.m.  (Burkart Dep. at 42.)  Officers Gruenwald, St. Germaine, Nicholas, and Burkart each testified that the police knocked and announced their presence and purpose by shouting "police, search warrant," before forcing entry into the Pierce residence.  (Defs.' Mot., Ex. 9, Officer Gruenwald Report; Gruenwald Dep. at 18; St. Germaine Dep. at 14; Nicholas Dep. at 14; Burkart Dep. at 43.)  These Officers further testified that, after knocking and announcing their presence and purpose, they waited a reasonable amount of time for the homeowners to respond before forcing entry.  Although the Officers could not recall the precise number of seconds, they testified that they generally waited from 10 to 30 seconds, depending on the situation.  The wait time generally took into consideration: (1) whether the search involved evidence that could be destroyed; (2) the size of the residence to be searched and how much time it would take someone to answer the door from the farthest point in the home; and (3) if late at night, the time it would take for someone to get out of bed and answer the door.  (Defs.' Mot., Ex. 9,

Officer Gruenwald Report; Gruenwald Dep. at 16-18; St. Germaine Dep. 14-16; Nicholas Dep. at 14; Burkart Dep. at 41-42.)

Plaintiff Barbara Pierce testified about the events that occurred at her tri-level home immediately before the police forcibly entered to execute the search warrant on October 31, 2001. Several lights were on in the home, including those in the kitchen, family room, and bathroom. Her husband Roger, who had been drinking that night, went to bed in an upstairs bedroom around 9:00 p.m., and was sleeping with the television on in the bedroom. Barbara was in an upstairs bathroom, brushing her teeth and going to the bathroom with the door closed. Her son Michael and his girlfriend Jacquelyn Young were in the lower-level family room playing a computer game. At about 10:00 or 10:30 p.m., her daughter Elizabeth and her boyfriend Ricky Marchand and two other male friends of theirs had gone to the store to get pop and snacks and planned on returning to the Pierce residence for the evening to play video games. (B. Pierce Dep. at 11-14, 22-23, 93-94.)

While in the upstairs bathroom with the door closed, Barbara heard "a horrible bang, crash" and then heard her son Michael scream. She opened the bathroom door, stepped into the hallway, and saw men with masks and guns entering her home and coming up the stairs towards her. She did not hear the police knock and announce their presence and purpose before hearing the loud bang and crash. (B. Pierce Dep. at 15-17, 63, 93-94.)

Plaintiffs' son, Michael Pierce, testified that he was in the downstairs family room, playing an interactive computer game with his girlfriend Jacquelyn Young. To get to where he and his girlfriend were playing video games, Michael testified that one would have to walk through the front door, across the main floor living room, and down seven steps which were at the opposite end of the main floor living room from the front door. (M. Pierce Dep.

at 10-15; J. Young Dep. at 10-11.) Michael and Jacquelyn were playing video games for about an hour when he heard his dog barking in the main floor living room and went to see why the dog was barking. (M. Pierce Dep. at 13-15.) Jacquelyn testified that Michael asked her if she heard a noise, and she replied that she did not. Then she heard the dog bark, and noted that he usually barked when someone was there. Michael then got up from his chair and went to the stairs leading to the main floor living room. (J. Young Dep. at 10-11.) Michael testified that he went up a couple of the stairs and saw the front door swing open and men in black, wearing masks coming into the house. (M. Pierce Dep. at 13-16.) Jacquelyn Young testified that she did not hear the police knock on the door or announce "police." (J. Young Dep. at 12.)

Plaintiff Roger Pierce admits that he was "sleeping soundly in his bedroom" when the police entered his home and did not wake up until the police were in his bedroom. (R. Pierce Dep. at 66-67.)

Once in the home, the police secured the residence and executed the search warrant. As a result of the search, Officers found a ziplock bag containing 1.8 grams of marijuana, numerous other sandwich bags with residue, hand scales, and an additional 2.5 grams and 1.6 grams of marijuana respectively. (Nicholas Dep. at 52-54.) Elizabeth Pierce and Ricky Marchand arrived at the home after the search warrant had been executed but before the police had left. (Defs.' Mot., Ex. 9, Gruenwald Report; E. Pierce Dep. at 14-25.) After the search was executed, the prosecutor issued warrants for Elizabeth and Michael Pierce, and Ricky Marchand for drug trafficking out of the Pierce residence, but no charges were brought because both Elizabeth and Ricky agreed to cooperate with the police. (Burkart Dep. at 61-62.)

5

Plaintiff Roger Pierce originally filed this action against Defendants St. Germaine, Lawson, Nicholas and Burkart in October 2003. This Court dismissed Plaintiff's state-law claims without prejudice in November 2003. Plaintiff filed an Amended Complaint on November 14, 2003, alleging a § 1983 claim of excessive force in violation of his Fourth and Fourteenth Amendment rights, and re-alleging state-law claims that were previously dismissed. On December 19, 2003, this Court issued a second order dismissing Plaintiff's state-law claims without prejudice.

After the close of discovery and two weeks before the dispositive motion cut-off date, Plaintiff filed a motion for leave to amend his complaint to add an additional § 1983 claim based on Defendants' alleged failure to knock and announce their presence before executing the search warrant. The Court denied Plaintiff's motion, finding the request for an amendment untimely and unduly prejudicial.

Plaintiff and his wife subsequently filed a new cause of action against these same Defendants alleging a § 1983 claim that their Fourth and Fourteenth Amendment rights were violated when the police failed to knock and announce their presence prior to gaining entry into their home and a loss of consortium claim. (Case No. 04-74185, filed Oct. 26, 2004.) Plaintiffs' cases were consolidated by this Court on January 26, 2005.

**II.   Standard for Summary Judgment**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c)

mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Analysis

This matter is now before the Court on Defendant Officers' motions for summary judgment arguing that: (1) there was no constitutional violation because the police knocked and announced their presence and purpose and then waited a reasonable time before forcing entry into Plaintiffs' home; and (2) even if there was a constitutional violation, they are entitled to qualified immunity. Plaintiffs argue the opposite. The Court begins its analysis with an examination of the general legal principles governing Plaintiffs' § 1983 claim alleging a violation of the Fourth Amendment.

Section 1983 imposes civil liability on any person who, acting under color of state law,

deprives another person of the "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "While government officials may be subject to § 1983 actions for violating an individual's constitutional right, a plaintiff must overcome the officials' qualified immunity in bringing such an action." *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 940-41 (6th Cir. 2004).

To determine whether qualified immunity is available, the Court conducts a three-step inquiry:

> First, [it] determine[s] whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred. Second, [it] consider[s] whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, [it] determine[s] whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotes and citations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### A. Alleged Constitutional Violation

Considering the facts in the light most favorable to Plaintiffs, this Court must determine whether a rational jury could find that (1) Defendant Officers failed to knock and announce their presence before forcing entry into Plaintiffs' home; or (2) failed to wait a reasonable period of time after knocking and announcing and before forcing entry into Plaintiffs' home to execute the search warrant, thus violating Plaintiffs' Fourth Amendment rights.

### 1. Knock and Announce Requirement

In *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003), the Sixth Circuit summarized the knock and announce rule:

> Law enforcement officers must knock and announce their presence and authority before entering a residence to execute a warrant. *Miller v. United States*, 357 U.S. 301 (1958); *United States v. Nabors*, 901 F.2d 1351, 1354 (6th Cir. 1990). . . . The knock and announce rule "forms a part of the reasonableness inquiry under the Fourth Amendment." *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995). This court has emphasized that police must wait a reasonable period of time before "physically forcing their way into a residence." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000) (citing *United States v. Finch*, 998 F.2d 349, 354 (6th Cir. 1993)). Failure to knock and announce prior to forcibly entering a location to execute a search warrant, absent exigent circumstances, is unreasonable under the Fourth Amendment. *Dice*, 200 F.3d at 982. To determine whether officers have complied with the knock and announce rule requires the court to analyze the facts and circumstances on a case-by-case basis. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

The Sixth Circuit has consistently refused to adopt a *per se* rule for determining a reasonable length of time after announcing their presence before officers may forcibly enter a residence. *United States v. Pennington*, 328 F.3d 215, 220 (6th Cir. 2003); *United States v. Spikes*, 158 F.3d 913, 926 (6th Cir. 1998) (declining "to create a bright-line rule for every case").

Construing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, there is no genuine issue of material fact that the police knocked and announced their presence and purpose on October 31, 2001 before forcibly entering Plaintiffs' home. Defendant Officers consistently testify that they did so. Testimony by occupants of the home that they did not hear the police knock and announce does not give rise to a reasonable inference that the police failed to do so and thus is insufficient to defeat summary judgment. At the time of entry, it is undisputed that Roger Pierce was sleeping; that Barbara Pierce was in an upstairs bathroom with the door closed,

using the toilet and brushing her teeth; and that Michael Pierce and Jacquelyn Young were in the lower-level family room of the tri-level home playing a game at a computer located in the farthest point from the front door where the police entered. (Pls. Ex. G, drawing of floor plan.) To infer that the occupants of the Pierce residence did not hear the police knock and announce because they failed to do so, requires improper speculation and conjecture.

**2. Reasonable Waiting Period**

The Court next considers whether Defendant Officers waited a reasonable period of time between their knock and announcement and their forced entry. A recent Supreme Court decision addresses this issue. *See United States v. Banks*, ___ U.S. ___, 124 S. Ct. 521 (2003).

In *Banks*, the Court considered whether a "15-to-20-second wait before a forcible entry" during execution of a search warrant for drugs in a two-bedroom apartment satisfied the Fourth Amendment. It began by observing that such questions are analyzed by "examining the totality of the circumstances in a given case" and further observing that "exigency may develop in the period beginning when officers with a warrant knock to be admitted. . . ." *Id.* at ___, 124 S. Ct. at 525, 526. It then concluded that a 15-to-20 second wait was reasonable in drug cases involving easily disposable evidence because "police could fairly suspect that [the drugs] would be gone if they were reticent any longer." *Id.* at ___, 124 S. Ct. at 526 (citing *United States v. Spikes*, 158 F.3d 913, 925-27 (6th Cir 1998) along with other Court of Appeals decisions reaching the same conclusion in drug cases).

The *Banks* Court rejected arguments, similar to those raised here, that the interval between the announcement and entry was too brief because Banks was in the shower and

did not hear the police and, even if he had, he would need more than 15-to-20 seconds to get out of the shower and answer the door. The proper focus for the reasonableness standard at issue, the Court emphasized, were "the facts known to the police" and there was no indication that the police knew Banks was in the shower and could not hear them. *Id.* at ___, 124 S. Ct. at 527. The Court also rejected the argument that more time was required to allow Banks to answer the door before entry because it "ignores the very risk that justified prompt entry"; i.e., a reasonable suspicion of the imminent loss of easily disposable drug evidence. *Id.* "In this case, . . . the police claim exigent need to enter, and the crucial fact in examining their actions is not time to reach the door but the particular exigency claimed. . . . And 15 to 20 seconds does not seem an unrealistic guess about the time someone would need to get in a position to rid his quarters of cocaine." *Id.* The Court summarized its holding:

> Absent exigency, the police must knock and receive an actual refusal or wait out the time necessary to infer one. But in a case like this, where the officers knocked and announced their presence, and forcibly entered after a reasonable suspicion of exigency had ripened, their entry satisfied . . . the Fourth Amendment, even without refusal of admittance.

*Id.* at ___, 124 S. Ct. at 529.

The Sixth Circuit has long recognized these same principles. In *United States v. Spikes*, it refused to adopt a "bright-line rule for every case," and observed that "the 'knock and announce' rule is to be applied under the 'flexible requirement of reasonableness.'" 158 F.3d at 926 (quoting *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)). It clarified that "[t]he Fourth Amendment's 'knock and announce' principle, given its fact-sensitive nature, cannot be distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance." *Id.*

11

The *Spikes* Court further observed that "[i]n drug cases, where drug traffickers may easily and quickly destroy the evidence of their illegal enterprise by simply flushing it down the drain, 15 to 20 seconds is certainly long enough for officers to wait before assuming the worst and making a forced entry." *Id.* (internal quotes and citations omitted.) The *Spikes* Court was careful to point out that although "the presence of drugs in the place to be searched" was "not a conclusive factor," it did "lessen[] the length of time law enforcement must ordinarily wait outside before entering a residence." *Id.* Other factors to be considered by the court include the time of day of the search and evidence that people "are awake and engaged in everyday activities" and "how much time it would take for a person in the house to open the door." *Id.* at 927. *Accord United States v. Gatewood*, 60 F.3d 248, 249 (6th Cir. 1995) (concluding that waiting 10 seconds was reasonable in a drug case).

Applying these principles here, this Court concludes that there is no genuine issue of material fact that Defendant Officers waited a reasonable amount of time before they forcibly entered Plaintiffs' home. At the pre-search briefing, Defendant Officers were informed that Elizabeth Pierce's live-in boyfriend was dealing marijuana out of the Pierce home and that it was possible that Elizabeth Pierce was doing so as well. Contrary to Plaintiffs' arguments here, there is no evidence that, at the time of the search, Defendant Officers knew that Ricky Marchand and Elizabeth Pierce were not at home. Moreover, the decision to wait 10-to-30 seconds before entry was reasonable because the police were searching for marijuana, an easily disposable drugs. Furthermore, even though it was 11:00 p.m., there were lights on in the kitchen and the bathroom; two locations where drugs are easily disposed. The presence of internal lighting in these and other rooms of the

12

house likewise support a reasonable belief that residents were awake and moving about the home while engaged in everyday activities.

In light of the above, this Court concludes that Defendant Officers did not violate Plaintiffs' Fourth Amendment rights as set forth in the knock and announce rule.

### B. Clearly Established Law

This Court further concludes that, even if a constitutional violation had occurred, Defendant Officers would be entitled to qualified immunity. "Qualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, ___ U.S. ___, ___, 125 S. Ct. 597, 599 (2004). As recently observed by the Supreme Court:

> Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

*Id*. Moreover, when conducting this inquiry, the Court must consider the specific context of the case, not just broad propositions. *Id*. "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). *See also Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir. 1997) (observing that the Court must "examine the asserted right at a relatively high level of specificity," and that "[t]he right must have been 'clearly established' not just is an abstract sense, but in a 'particularized' sense."). It is Plaintiffs' burden to convince the Court that the law is clearly established. *Cope,* 128 F.3d at 459.

As instructed by the Supreme Court in *Brosseau*, this Court must examine cases relevant to the situation Defendant Officers confronted. As further instructed by the Sixth Circuit, "[i]n inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit Court of Appeal] and other courts within [the Sixth Circuit], and finally to decisions of other circuits." *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993). Considering the relevant Sixth Circuit cases decided before the events of October 31, 2001, this Court concludes that it was not "clearly established" that Defendant Officers' conduct violated the Fourth Amendment. Accordingly, they would be entitled to qualified immunity.

### III. Conclusion

For the foregoing reasons, Defendants' motions for summary judgment on Plaintiffs' newly-filed "knock and announce" claim are GRANTED.

        s/Nancy G. Edmunds  
        Nancy G. Edmunds  
        United States District Judge

Dated: August 4, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 4, 2005, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer  
        Case Manager